Filed 9/28/20  In re A.N. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.N., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>A.K.,<br><br>        Defendant and Appellant. | A157369<br><br>(Alameda County<br>Super. Ct. No. JD02859101) |

A.K. (mother) appeals from juvenile court orders denying her petitions under Welfare and Institutions Code section 388, in which mother asked the court not to set a Welfare and Institutions Code section 366.26 hearing to terminate her parental rights as to her daughter, A.N. (minor), and from the order at that hearing terminating her parental rights.[1]  She also argues she received ineffective assistance of counsel at various stages of the proceedings. We find no error in the court's orders, and we further conclude that any

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

1

deficiencies in counsel's representation did not cause mother prejudice. We shall affirm the juvenile court's orders.

## BACKGROUND

### I. Detention, Jurisdiction, and Disposition (August 2017 to November 2017)

In August 2017, the Alameda County Social Services Agency (agency) filed a dependency petition alleging the minor, born in August 2012, came within the juvenile court's jurisdiction under section 300, subdivision (b)(1) and (g) because of mother's substance abuse and incarceration. The case arose from an incident in late July 2017 in which police found mother asleep in a car and the minor in the backseat without a child safety seat. Police found suspected methamphetamine and pipes in the front areas of the car and suspected marijuana in a clear bag on the floor near where the minor had been sitting. The minor said she had seen mother smoke "weeds" and get drunk, which the minor did not like. Mother had a lengthy history of criminal convictions dating back to 2000. Mother was arrested on one charge of willful cruelty to a child and other charges related to possession of a controlled substance. The minor's father was alleged to be in jail.

Mother told a social worker she had been using methamphetamine for about 20 years. She had entered both residential and outpatient treatment for her drug use in the past but had not been able to stay sober for more than two years. Mother had been trying to stop using methamphetamine at the time of her arrest but had relapsed due to her low energy levels. She stated that she no longer had any desire to use methamphetamine, but explained it was difficult to abstain from drug use because of the amount of drugs on the streets. The social worker was concerned that mother could remain free of methamphetamine for short periods of time but could not sustain the effort without support.

Mother said the minor had been staying with the paternal grandparents since January 2017, with mother visiting with the minor on most Sundays. The minor said she liked living with her paternal grandmother (grandmother) and appeared to the agency to have bonded well with the grandmother. The grandmother told a social worker through an interpreter that she had helped care for the minor since she was a baby and had enrolled her in school near the grandmother's house. The minor's alleged father said the minor had lived with the grandmother for most of her life.

At the detention hearing, the court ordered the minor detained and removed from mother's custody. Mother submitted on the agency's report on the first day of jurisdiction/disposition hearing in August 2017. The court then declared the minor a dependent of the court, removed her from mother's custody, and ordered reunification services for mother. The court set visitation for mother at twice weekly for two hours in length but also ordered the agency to arrange for visitation as frequently as possible consistent with the minor's well-being.

Mother began submitting to drug tests and visiting with the minor more than the court's minimum two visits per week. The test results between August 10, 2017, and October 30, 2017, showed mother tested positive for methamphetamine once about a week after the minor's detention, positive for alcohol five times, and positive for marijuana on all of the tests.

Mother was arrested in late October 2017 on charges including felony driving with a blood alcohol over 0.08 percent causing injury (Veh. Code, § 23153, subd. (b)), excessive blood alcohol or refusal to take an alcohol test (Veh. Code, § 23578), felony leaving the scene of an accident that resulted in injury or death (Veh. Code, § 20001, subd. (a)), felony reckless driving with serious injury (Veh. Code, § 23103, subd. (a)), and a special allegation of

3

causing great bodily injury in the commission of a felony (Pen. Code, § 12022.7, subd. (a)).

After a DNA test confirmed the paternity of the minor's alleged father, the court held another jurisdiction/disposition hearing repeating its prior order declaring the minor a dependent of the court, removed her from mother's and her biological father's custody, and ordered reunification services for mother. The court again ordered the agency to arrange for visits as frequently as possible consistent with the minor's well-being. The court gave the agency discretion to arrange for visitation between mother and the minor once every other week if mother was in the "MOMS" program at jail.

## II. Six-month review period and hearing (November 2017 to May 2018)

At the time of the six-month hearing in May 2018, mother was still in jail and had been participating in the services available to her through the jail's MOMS program, which were parenting, anger management, and substance abuse classes. Mother wanted to be released to an inpatient substance abuse program in order to reunify with the minor. About a month before the end of the six-month review hearing, mother's criminal defense attorney told a social worker that he expected that at an upcoming hearing the district attorney would offer mother one to three years in jail on her charges, with the six months mother had spent in jail counting towards that time. A few days later, the district attorney instead offered mother five years in prison, of which mother would serve 85 percent. Mother was concerned that accepting the offer would prevent her from reunifying with the minor.

The minor was doing well at the grandmother's home and at school, with no concerns about her physical or emotional health or her relationship with peers. The agency's report described her as a sweet, shy, and creative

4

five-year-old who was talkative once she became comfortable.  The minor liked living with her grandparents.

The agency reported that mother had not visited with the minor during the reporting period.  Mother's child endangerment charge made her ineligible for contact visits with the minor.  Mother called the minor on the phone weekly and sent her mail.  Mother thought it would be fine for the minor to visit her in jail even though it would be hard for her.  Mother suggested to a social worker that she could also video chat with the minor.  The social worker was concerned that if the minor visited the mother at the jail, it might make her scared and worried, affect the minor's emotional well-being, and disrupt the stability and structure the grandmother had provided for the minor.

At the six-month review hearing, mother requested video visits.  The juvenile court said it was not familiar with video visits, but some level of visitation was appropriate, so the court ordered the agency to arrange for one video visit per week if it was not prohibitively expensive.  The court also gave the agency discretion to set up contact visits if mother were to become eligible.  The court instructed the parties that if the costs of video visits were prohibitive the parties should place the issue on the calendar to devise another plan.

## III. 12-month review period and hearing and termination of reunification services (May 2018 to January 2019)

In early September 2018, the court appointed a new lawyer to represent mother because the Judicial Council had chosen a new organization to represent parents in dependency cases in Alameda County.

At the time of the 12-month review hearing in September 2018, mother remained in jail on two pending criminal cases.  The first case arose from the incident that gave rise to the dependency action and the second involved

driving under the influence and injuring a child. Mother's criminal defense attorney was still trying to negotiate a deal with the district attorney. The agency recommended terminating reunification services because mother's continued incarceration, with no known release date, prevented her from providing for the minor's needs or demonstrating her ability to stay sober or parent the minor.

Mother had been doing well with all the services available to her in jail. She had been working with a job center and had received a food handler's license. She was on track to graduate from the parenting program the same month as the hearing and had completed 45 of 60 substance abuse classes before the program was cancelled. The social worker believed mother was committed and motivated to resolve her substance abuse issues and criminal case.

The agency reported that mother had not visited with the minor during the reporting period. Mother remained ineligible for contact visits because of her child endangerment charge. A social worker had been unable to arrange video visits because the video visiting application was only for Android phones and no one in the grandmother's family had that kind of phone. Mother continued to call the minor, but the minor was reluctant to get on the phone. The social worker and the minor's caregivers were worried about the minor visiting mother at the jail without the support of the MOMS program because such visits could affect the minor's emotional well-being and disrupt the stability and structure the grandmother was providing.

The agency's report described the minor as sweet and creative, and her caregivers said she was doing well at school and at home. She continued to thrive in the grandmother's care. Her caregivers had no concerns about her health or well-being and said she was well-behaved and easy-going. The

minor liked living with her grandparents, and the grandmother was interested in adopting the minor.

At the initial date for the 12-month review hearing in September 2018, mother said she wanted to contest the agency's recommendation to terminate services, so the juvenile court set a contested 12-month review hearing in late November 2018. The court selected that date to allow some time to see how mother's criminal case was progressing.

By the time of the continued 12-month review hearing in late November 2018, mother had graduated from her parenting class. The grandmother remained interested in adoption. Mother's criminal defense attorney was still negotiating with the district attorney, so mother again asked to continue the hearing. The court noted that another continuance would mean the 12-month hearing would be held shortly before the 18-month deadline in February 2019. The court said it expected that even if mother's criminal case resolved by the time of a continued 12-month hearing, there would likely be a dispute about whether the minor could be returned to mother by the 18-month deadline. The court granted the continuance.

At the next date for the 12-month review hearing in January 2019, mother requested a third continuance. Mother's criminal case was still not resolved, but mother believed the district attorney would make her an offer at a hearing in her criminal case within a week. The juvenile court noted that there was no guarantee that an offer would actually be extended. The court was also concerned that even if mother were released, there would be little time before the 18-month deadline in one month for mother to demonstrate progress towards having the minor placed with her. The court said it could not extend past the 18-month date except to set a hearing. But the court observed that it could schedule a section 366.26 hearing permanency

planning hearing for 120 days later, which would give mother more time to get into a program, show what she had done, and file a petition under section 388 before the hearing. The court said mother should "absolutely file" a section 388 petition, and it denied mother's request for a continuance.

After denying the continuance, the court found that reasonable services had been offered or provided and that returning the minor to mother would create a substantial risk of detriment because mother had not alleviated or mitigated the cause of the minor's removal. The court then set a section 366.26 hearing for May 1, 2019. The court also said that any party wishing to preserve the right to appeal the setting of the section 366.26 hearing needed to pursue a writ within seven days using available forms and could receive free counsel for the writ petition. Mother did not file a writ.

## IV. Hearings on section 388 petitions and section 366.26 hearing (January 2019 to May 2019)

Mother was released from jail on March 14, 2019, to court-ordered treatment at a residential substance abuse treatment facility that permitted visitation with children and allowed children to reside with their parents.

About a month later, mother filed a section 388 petition asking the court to change its order terminating reunification services. The petition alleged her progress in services in jail and after being released demonstrated changed circumstances and that the change was in the minor's interests because it would give the minor access to better schools, safe housing, and children to be around, as well as allow her to develop a strong bond with mother. Mother also filed a motion with legal arguments supporting the petition, arguing that she met the statutory criteria for extension of services until the 24-month mark.

The agency's report for the May 1, 2019 section 366.26 hearing recommended terminating mother's parental rights so the minor could be

8

adopted.  A social worker stated that mother had recently been released from jail and opined that she was not in a position to take care of the minor.  The report noted that the minor had not visited mother in jail because mother was ineligible for contact visits and video visits were not possible.  The report described how mother had called the minor once per week during her incarceration, but the minor sometimes covered her ears and did not want to talk.  When the minor did speak with mother, she responded to mother's questions but did not ask mother questions.  However, after mother's release, the minor responded with enthusiasm when asked how she felt about visiting mother.

The report described the first visit the minor had with mother after her release from jail.  The visit went well, and although the minor pulled away from a hug in the middle of the visit, she appeared to enjoy and be open to mother's hugs at the beginning and end of the visit.  The minor said she was pleased with the visit and wanted more visits.

The report described the minor as a friendly, active, and social girl who enjoyed dancing, reading, playing with dolls, playing with an iPad, and kicking a ball in the yard.  The minor was thriving in the grandmother's care.  The minor was in the first grade, had made rapid progress from reading slightly below grade level to above grade level in reading, and was above grade level in math.  There were no concerns about her physical health, emotional well-being, relationships with peers, or behaviors.  The report stated the minor was adoptable and was a healthy six-year-old girl with no developmental, emotional, or behavioral issues that would preclude adoption.  The report also noted that the minor wanted to stay with her grandmother, who was willing and able to adopt her.

At the section 366.26 hearing on May 1, 2019, the court began by discussing mother's section 388 petition. Mother requested a continuance to present all of her evidence of rehabilitation because she argued the termination of reunification services had been based only on mother's continued incarceration. She also said she would agree to a legal guardianship but wanted to avoid a termination of her parental rights. The court concluded that everyone except mother agreed that none of the legal options for continuing reunification services applied. The court said it did not think there was a change in circumstances, but that mother could get there on that element. But the court found it was not in the minor's best interests to order the reinstatement of services when that was not legal. The court also found it was not in the minor's best interests because it was not appropriate to pull the minor out of the grandparents' home and place her with mother as mother was getting acclimated in a residential substance abuse program. The court therefore denied the section 388 petition. The court then continued the section 366.26 hearing because it had run out of time.

In advance of the next section 366.26 hearing, mother filed another section 388 petition and supporting motion with legal authority asking the court to change its order terminating reunification services. The supporting allegations were generally similar to those in the first petition, as were the legal arguments in the supporting motion. But mother attached to this petition various documents including certificates of her completion of various programs while in jail, a certificate demonstrating her progress in her residential treatment program, and three letters of support from her program's staff.

The agency submitted an addendum report for the section 366.26 hearing. The addendum presented a letter from the paternal aunt purporting to set out the grandmother's statements about the minor. The letter said the grandmother had taken care of the minor since she was two months old and that mother had only cared for the minor for about three to four days each month from 2012 to 2017. The letter reaffirmed that the grandmother remained interested in adoption.

At the hearing on May 24, 2019, mother's counsel requested a continuance. He said he had intended to call the grandmother as a witness because she had told him through a professional interpreter that the letter attached to the agency's addendum report was not accurate. However, she had not appeared at the hearing. Because mother's counsel had not subpoenaed the grandmother, the court found there was not good cause and denied the request for a continuance.

The court denied this section 388 petition because it offered no new evidence and restarting reunification services was not in the minor's best interests because there was no legal vehicle to do so.

The court then proceeded with the section 366.26 hearing. Mother testified on her own behalf and called as witnesses a supervisor at her residential treatment center and a social worker. The supervisor and social worker testified about mother's two visits with the minor at the residential treatment facility. Mother described the minor's upbringing before the minor was removed from mother's care, her contacts with the minor while she was in jail, and the most recent visits.

After hearing argument, the court found the minor was adoptable and had family members willing to adopt her. The court also found mother had regularly visited or contacted the minor. But the court concluded the minor

11

no longer viewed mother as a parent or had a parental connection to her. The court therefore found the beneficial parent-child relationship exception did not apply. The court ordered termination of mother's parental rights.

Mother filed a notice of appeal on May 30, 2019, stating she was appealing the May 24, 2019 termination of her parental rights. She filed an amended notice of appeal on July 5, 2019, stating she was appealing all orders at the section 388 and section 366.26 hearings on May 1 and May 24, 2019.

## DISCUSSION

### I. Merits of denial of section 388 petitions

Mother argues the juvenile court erred by concluding it lacked statutory authority to restart reunification services, so its denial of her section 388 petitions on that basis was in excess of its jurisdiction. She further argues the juvenile court should have ordered a hearing on her petitions because they set forth a prima facie case for relief. We agree that the juvenile court had authority to rescind its order terminating reunification services, but we conclude the error caused mother no prejudice because her

12

petitions failed to make a prima facie showing that rescinding the order was in the minor's best interests.[2]

## A. Relevant legal principles and standard of review

Section 388, subdivision (a)(1) allows a parent or other person interested in a dependent child to petition the court to change or set aside any previous order in the same dependency action. The petition must set forth a concise statement of the new evidence or changed circumstances that require changing the order. (*Ibid.*) The court may deny a petition under section 388, subdivision (a) without a hearing if the petition "fails to state a change of circumstance or new evidence that may require a change of order . . . or fails to show that the requested modification would promote the best interest of the child." (Cal. Rules of Court, rule 5.570(d)(1); *In re*

---

[2] The agency contends mother's challenge to the denial of her first section 388 petition is untimely, because the only notice of appeal she filed within 60 days of that order said it was appealing from the termination of her parental rights and did not mention the denial of her first section 388 petition. The court in *In re Madison W.* (2006) 141 Cal.App.4th 1447, 1451 explained that it routinely deemed notices of appeal from termination of parental rights to include denials of section 388 petitions filed within the previous 60 days. However, *In re J.F.* (2019) 39 Cal.App.5th 70, 77–78, recently declined to follow *Madison W.* where a juvenile court denied a section 388 petition in a separate hearing 44 days before the termination of parental rights and appellant's briefing only addressed the 388 petition. We will follow *Madison W.* and liberally construe mother's notice of appeal. *J.F.* is distinguishable on this point because the denial of mother's first section 388 petition was on the first day scheduled for the section 366.26 hearing, mother filed an amended notice of appeal before briefing began, mother's briefing addresses both the denial of her section 388 petitions and the section 366.26 orders, and the agency has not argued it was prejudiced.

13

*Kimberly F.* (1997) 56 Cal.App.4th 519, 526 & fn. 5 (*Kimberly F.*).)[3] "We review the juvenile court's summary denial of a section 388 petition for abuse of discretion." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

## B. Discussion

The juvenile court believed it needed some authority to grant mother's section 388 petitions and order reunification services to 24 months after the minor was removed from mother's care. This was error.

*In re Marilyn H.* (1993) 5 Cal.4th 295 (*Marilyn H.*) explained the role that section 388 petitions serve in ensuring that the juvenile dependency system satisfies due process. The mother in that case argued that due process required a juvenile court to consider placing a child with a parent at the section 366.26 permanency planning hearing. (*Id.* at p. 306.) The court held that even though section 366.26 did not allow a court to re-examine the issue of reunification with a child's parent when selecting a permanent plan, it was still constitutional because a parent could raise that issue via a section 388 petition. (*Id.* at p. 309.) The court noted that "throughout the reunification period *and thereafter*, the parent has the *continuing right* to petition the court for a modification of any of its orders based upon changed circumstances or new evidence pursuant to section 388." (*Id.* at pp. 308–309, italics added.) *Marilyn H.* also explained that "the Legislature has provided the procedure pursuant to section 388 to accommodate the possibility that circumstances may change *after the reunification period* that may justify a change in a prior reunification order. A petition pursuant to section 388 may be used to raise the issue in the trial court prior to the section 366.26

---

[3] The Judicial Council recently amended other parts of California Rules of Court, rule 5.570, effective January 1, 2020. The changes are immaterial to this case, so for simplicity we cite to the current version of this rule.

hearing." (*Marilyn H.,* at p. 309, italics added.)  The court reasoned that this satisfied due process in part because after reunification services end, "the child's interest in permanency and stability takes priority."  (*Id.* at p. 309.)[4] The court concluded that the availability of section 388 relief therefore provided the " 'escape mechanism' " necessary for a parent to raise new information after the termination of reunification services.  (*Ibid.*)

"*Marilyn H.* makes clear that reunification pursuant to section 388 must remain a viable possibility even after the formal termination of reunification services in a 12- or 18-month review.' " (*Kimberly F., supra,* 56 Cal.App.4th at p. 529.)  The juvenile court therefore erred when it stated that it could not grant mother's first and second section 388 petitions because it lacked statutory authority to order the resumption of reunification services.

Although the court erred by misperceiving the scope of its authority, we do not agree with mother that the error caused her prejudice.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 [error results in reversal only if it appears "reasonably probable" the appellant would have obtained a more favorable outcome absent the error].)  At the hearing on mother's first section 388 petition, the juvenile court said it did not find mother had made a prima facie showing that her requested changes to the juvenile court's order terminating reunification services was in the minor's best interests.  The court noted that mother was getting on her feet after having been released from jail six weeks earlier and was becoming acclimated to a residential substance abuse

---

[4] When *Marilyn H.* was decided, reunification services could be extended, at most, to 18 months.  (*Marilyn H., supra,* 5 Cal.4th at p. 308.) The law now allows for extensions of reunification services to 24 months in some circumstances.  (§ 361.5, subd. (a)(4).)  Although the period of reunification may be longer now, section 388 petitions play the same role after termination of reunification services, whenever such termination occurs.

program. The court characterized the minor, meanwhile, as "thriving" in a stable placement with family. The court therefore found it was not in the minor's best interests to pull her out of her placement.

This conclusion was not an abuse of discretion. While mother made an extensive showing regarding changed circumstances, the only allegations in mother's first section 388 petition regarding the minor's best interests were that mother's requested changes would give the minor "safe housing, children to be around, access to good schools," and the opportunity to continue to bond with her mother. However, according to the agency's report for the section 366.26 hearing that began on the same day, the minor had no physical, mental, or dental health issues; was experiencing age-appropriate development; and was doing well at a comprehensive public school at grade level. There were no concerns about her relationships with her peers or her behaviors. Mother's allegations about safe housing, good schools, and access to peers do not explain how mother's housing was so superior on these dimensions as to warrant disrupting the minor's stability. Given that the minor was flourishing in her placement with her grandmother, the court did not abuse its discretion in finding mother's allegations insufficient to make a prima facie case that restarting the reunification process was in the minor's best interests.[5]

The court's explanation of the basis for its denial of mother's second section 388 petition was limited to its erroneous belief about its lack of

---

[5] The agency did not address the merits of the juvenile court's denial of mother's first section 388 petition, apparently choosing instead to rely on its argument that mother's appeal from that order was not timely. Even if the agency's silence on the merits could be construed as a concession that the order was reversible, we need not accept it. "The juvenile court's orders are 'presumed to be correct, and it is [mother's] burden to affirmatively show error' " as the appellant. (*In re J.F.*, *supra*, 39 Cal.App.5th at p. 79.)

authority to resume reunification efforts. However, even if the court had recognized its authority, it is not reasonably probable the court would have altered its conclusion from three weeks earlier that it was not in the minor's best interests to jeopardize the stability of her current placement by resuming reunification efforts with mother. The denial of mother's second section 388 petition on an erroneous basis thus caused no prejudice.

Mother argues her petitions satisfied the factors for proving a child's best interests set forth in *Kimberly F.*, *supra*, 56 Cal.App.4th at pages 530–532. Those factors are: "(1) [t]he seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Id.* at p. 532.) We need not delve deeply into mother's showing related to these factors. Suffice it to say that the problems leading to the dependency—substance abuse that put the minor at risk and mother's incarceration—were serious,

but mother made substantial progress in jail and by working with a treatment program after securing her release from jail.[6]

However, as noted in *In re J.C.* (2014) 226 Cal.App.4th 503, 526–527, a case where a parent made progress similar to mother's here, the *Kimberly F.* factors do not take sufficient account of the fact that after a court has terminated reunification services, the focus shifts to the minor's need for permanency and stability. Specifically, in its second factor *Kimberly F.* recognized the importance of a minor's relationship with her caretakers but held that the focus on a minor's "bond to the caretaker cannot be dispositive [citation], lest it create its own self-fulfilling prophecy." (*Kimberly F., supra,* 56 Cal.App.4th at p. 531.) Although *Kimberly F.* is correct that a child's

---

[6] Mother filed a motion to augment the record asking us (1) to take judicial notice of a minute order from one of her criminal cases and (2) to take additional evidence under section 909 of the Code of Civil Procedure consisting of various documents demonstrating her success in her residential treatment program, both before and after the juvenile court's orders denying her section 388 petitions. We grant the request for judicial notice of the minute order as a court record (Evid. Code, §§ 452, subd. (d), 459, subd. (a)) but otherwise deny the motion. Our authority to take evidence under section 909 of the Code of Civil Procedure "should be exercised sparingly," only in exceptional circumstances. (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1389.) The purpose of the statute " ' "is to enable appellate courts, in appropriate cases, to terminate litigation . . . if it appears that on no reasonable theory could respondent make a further showing in the trial court. [Citations.]" [Citation.] They do not warrant an appellate court's general reversal of a judgment on the basis of newly discovered evidence presented in the appellate court." ' " (*Ibid.*; see also *In re B.D.* (2019) 35 Cal.App.5th 803, 809 [motion under Code of Civil Procedure section 909 should be granted only in " 'rare' " case where all parties recognize that additional evidence "stands to completely undermine the legal underpinnings of the juvenile court's judgment under review"].) Mother's evidence does not rise to this standard.

In any event, the evidence mother offers would not change our decision even if we considered it. Mother's evidence of progress in her treatment program is not sufficient to overcome the minor's interest in stability.

interest in remaining in his or her placement cannot be dispositive, neither should that interest be placed on equal footing with a parent's showing that he or she has ameliorated the circumstances that led to the dependency. Where, as here, a court has terminated reunification services, a child's "best interests are not to further delay permanency and stability in favor of rewarding [a parent] for [his or] her hard work and efforts to reunify. [A parent's] best interests are simply no longer the focus." (*In re J.C.,* at p. 527.) Thus, even if we use the *Kimberly F.* factors to guide our analysis, mother's showing on the first and third *Kimberly F.* factors is insufficient to overcome the evidence on the second factor about the extent of the minor's interest in remaining with her grandmother.

The emphasis on a minor's stability after reunification makes it difficult for a parent to obtain section 388 relief, but this does not render illusory *Marilyn H.*'s promise regarding the possibility of such relief. (*Marilyn H., supra*, 5 Cal.4th at pp. 308–309.) For example, if the minor had been placed with several different foster care families or were not thriving under the grandmother's care, then mother's section 388 petition might well have succeeded. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 465 [section 388 petition after termination of reunification services might be in child's best interest if child is not adoptable and parent is only mother figure in child's life].) But because the minor was thriving in her placement with a close family relative, the court reasonably determined mother had not made the necessary showing for section 388 relief. (*Id.* at pp. 462–463 [cases where denials of section 388 petitions were reversed involved parents who could demonstrate a present ability to resume care for children full time or children whose first choice was to reunify].)

We do not intend to minimize mother's admirable efforts and apparent success in alleviating the circumstances that led to the minor's removal. Mother may have felt betrayed by the juvenile court's instruction at the 12-month review hearing in January 2019 that mother should "absolutely file" a section 388 petition after release from jail in order to return to the reunification process, only to have the court summarily deny her petitions about four months later for lack of legal authority for the requested relief. However, the unfortunate reality is that mother was in jail for 17 months of this dependency case, starting around two and a half months after removal and running past the 18-month mark after removal. Mother quotes the statement from *In re S.D.* (2002) 99 Cal.App.4th 1068, 1077 that "there is no 'Go to jail, lose your child' rule in California." While true as a general matter, a parent's lengthy incarceration can still, in some circumstances, affect parental rights. That is what occurred here, where mother had not had custody of the minor for more than a year even before the dependency case began, mother was ineligible for contact visits in jail due to her child endangerment charge, and by the time mother was released, the minor's interest in maintaining stability with her grandmother had taken precedence. (See *Marilyn H., supra*, 5 Cal.4th at p. 309.) As our Supreme Court has noted, "Childhood does not wait for the parent to become adequate." (*Id.* at p. 310.)

## II. Termination of parental rights

Mother raises two challenges to the order terminating her parental rights. First, she contends there is no substantial evidence to support the juvenile court's finding that the minor was adoptable. Second, she argues the court should have found the beneficial relationship exception to adoption applies. We disagree with both arguments.

## A. Minor's adoptability

"The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time." (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1060.) "The adoptability issue at a section 366.26 hearing focuses on the dependent child, e.g., whether his or her age, physical condition, and emotional state make it difficult to find a person willing to adopt." (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1311.) "The likelihood of adoptability may be satisfied by a showing that a child is generally adoptable, that is, independent of whether there is a prospective adoptive family ' " 'waiting in the wings.' " ' [Citation.] However, the case law also recognizes that the juvenile court may properly consider a prospective adoptive parent's willingness to adopt as evidence that the child is likely to be adopted within a reasonable time." (*Id.* at p. 1313, italics omitted.) If a juvenile court finds a child is adoptable "only because a particular family is willing to adopt," then the court must consider legal impediments to adoption by the particular family. (*In re G.M.* (2010) 181 Cal.App.4th 552, 562.) If a court's adoptability finding is based in part on the willingness or commitment of an identified prospective adoptive parent, then evidence of legal impediments to adoption by that parent is "relevant" to a finding of adoptability, but a court does not have a duty to inquire into such impediments. (*Id.* at pp. 562, 564.) The prospective adoptive parent's subjective suitability is not a legal impediment, so questions regarding subjective suitability must be reserved for a subsequent proceeding. (*Id.* at p. 563.) "On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence the child was likely to be adopted within a reasonable time." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589; see

*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 ["When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true"].)

Mother argues the juvenile court did not find the minor was generally adoptable. She further argues that the record is insufficient to support the court's finding that the minor was likely to be adopted specifically by the grandmother. She also asserts the court had no evidence regarding alternative permanent placements.

It is unnecessary to examine mother's evidentiary arguments in detail because her fundamental premise is flawed. The juvenile court found the minor was adoptable both generally and specifically. The agency's report described the minor as a "friendly, kind, active and social girl" and a "sweet and creative 6-year-old." The report also said that the minor "is adoptable, and adoption is the appropriate permanent plan. She is a healthy six-year-old girl, with no developmental, emotional, or behavioral issues that would preclude adoption." The adoption assessment also noted that the minor was "placed with a relative who is willing and able to adopt her." The court stated at the hearing that the minor was "smart," "sweet," and "a beautiful kid," and then concluded "she's adoptable, but more importantly she does have family members who are willing to adopt her. So I do think there's clear and convincing evidence that [the minor] is, in fact, adoptable or likely to be adopted."

We conclude from this record that the juvenile court found the minor to be both generally adoptable based on the minor's own attributes and also specifically adoptable because of the grandmother's willingness to adopt.

Because the court did not rely solely on the grandmother's likelihood of adopting the minor, it had no duty to consider evidence of legal impediments to adoption by the grandmother. (*In re G.M.*, *supra*, 181 Cal.App.4th at p. 564.) Such evidence would have been relevant, but it was not necessary. (*Id.* at pp. 562, 564.) Further, "[c]ase law does not require evidence of additional approved families who are available and willing to adopt the children." (*In re A.A.*, *supra*, 167 Cal.App.4th at p. 1313.) The evidence regarding the minor's age, disposition, and physical condition is therefore sufficient to support the juvenile court's finding of adoptability by clear and convincing evidence.

## B.   Beneficial relationship exception to adoption

At a section 366.26 hearing, if the court finds a child is "likely to be adopted, adoption is the norm. Further, the court must terminate parental rights and order adoption, unless one of the specified circumstances in section 366.26, subdivision (c)(1), provides a compelling reason for finding that termination of parental rights would be detrimental to the child." (*In re A.A.*, *supra*, 167 Cal.App.4th at p. 1320.) Section 366.26, subdivision (c)(1)(B)(i) sets forth one exception to termination of parental rights known as the beneficial parent-child relationship or parental visitation exception. (*In re Grace P.* (2017) 8 Cal.App.5th 605, 612.) The parent bears the burden of proving the exception applies by a preponderance of the evidence. (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.) "The court's decision a parent has not satisfied this burden may be based on any or all of the component determinations—[(1)] whether the parent has maintained regular visitation, [(2)] whether a beneficial parental relationship exists, and [(3)] whether the existence of that relationship constitutes 'a compelling reason for determining

23

that termination would be detrimental to the child.' " (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646–647.)

"Appellate courts are divided over the appropriate standard of review for an order concerning the applicability of the beneficial relationship exception to termination of parental rights." (*In re Caden C.* (2019) 34 Cal.App.5th 87, 106 (*Caden C.*), review granted, July 24, 2019, S255839.) As mother and the agency both urge us to apply the hybrid standard of review in *Caden C.*, we will do so. Under this approach, "[u]nderlying factual determinations—such as whether a parent has maintained regular visitation or whether a beneficial parental relationship exists—are properly reviewable for substantial evidence." (*Ibid.*) We review for abuse of discretion a juvenile court's determination whether a beneficial parental relationship provides a compelling justification for forgoing adoption. (*Ibid.*)

Mother argues the court should have found the beneficial relationship exception applies. On the first element, she contends the court correctly found she maintained contact and visited the minor as much as she could. As to the second element, mother argues she proved that she occupied a parental role in the minor's life. On the third element, she contends the court abused its discretion in finding her relationship with the minor was not a compelling reason to refrain from terminating her parental rights. We disagree as to the second and third elements.

Substantial evidence supports the court's determination that mother met the first element. This element is quantitative and "simply evaluates whether the parent consistently had contact with the child." (*In re Grace P.*, *supra*, 8 Cal.App.5th at pp. 612–613.) Mother satisfied this element by consistently contacting the minor, either by calling the minor from jail or visiting in person before and after mother's incarceration.

24

But contrary to mother's position, substantial evidence supports the court's finding on the second element–that mother did not occupy a beneficial parental role. This element "involves a qualitative, more nuanced analysis," which "requires a parent to prove that the bond between the parent and child is sufficiently strong that the child would suffer detriment from its termination. [Citation.] In applying this exception, the court must take into account numerous variables, including but not limited to: 1) the age of the child, 2) the portion of the child's life spent in the parent's custody, 3) the ' "positive" ' or ' "negative" ' effect of interaction between parent and child, and 4) the child's unique needs." (*In re Grace P.*, *supra*, 8 Cal.App.5th 605, 613.) "Of necessity, however, the relationship at issue must be parental. 'No matter how loving and frequent the contact, and notwithstanding the existence of an "emotional bond" with the child, "the parents must show that they occupy 'a parental role' in the child's life." ' " (*Caden C.*, *supra*, 34 Cal.App.5th at p. 105.)

As to the first two variables relevant to the second element–the child's age and portion of life spent in the parent's custody–the minor was six years and nine months old when the section 366.26 hearing concluded. Mother testified that the grandmother began caring for the minor three days and nights per week when the minor was one and a half years old and full time from the time the minor was three and a half years old until the dependency case began in August 2017.[7] The minor continued to live with her grandmother until the section 366.26 hearing on May 24, 2019. In total, the minor had been in the grandmother's custody for more than half of her life.

_____

[7] There is evidence that the grandmother began caring for the minor even earlier, starting from when the minor was two months old. As the juvenile court declined to resolve the conflict in the evidence on this point, we accept mother's version of events.

25

The first two variables thus do not support a finding of a beneficial parental relationship.

Evidence relevant to the third and fourth variables for the existence of a parental relationship–the quality of interactions between the parent and child and the child's needs–also leans against finding a beneficial relationship. Mother called the minor on the phone three times per week during her incarceration for about five or ten minutes each. During the calls, the minor called mother "mommy" and would respond to mother's questions but did not ask mother questions. However, the minor did not always want to talk to mother and sometimes put her hands over her ears.

After mother's release, mother and the minor had two in-person visits at mother's residential treatment facility. However, during these visits the minor no longer referred to mother as "mom" or "mommy." The visits went well, with mother preparing meals and playing with the minor. The minor wanted to see mother before the first visit. Mother gave the minor a hug at the beginning of the visit, which the minor seemed to enjoy, although she did not initiate the hug and pulled away from a hug in the middle of the visit. The minor was open to mother's hug at the end of the visit. Mother gave the minor a bag full of gifts during the visit. At the end of the first visit, the minor did not say much but did tell the social worker she enjoyed the visit and wanted more visits. According to mother, the minor stated that she wished every day was visitation day. When mother greeted the minor with a hug and a kiss at the second visit, the minor pulled back and said she did not want hugs. The minor later told the social worker she only liked receiving hugs from her dad and her aunt. Towards the end of the second visit, the minor asked mother to carry her from the playground to the office, and

26

mother obliged. The minor did not cry when she left the visits and instead said goodbye and waved.

Mother is correct that this evidence shows that mother's interactions with the minor were generally positive and that mother appeared capable of meeting the minor's needs, but it falls short of showing that mother occupied a parental role in the minor's life. The minor's failure to refer to mother using a parental term indicates the minor did not view mother as a parental figure. Mother speculates that the minor likely used a word in the paternal grandmother's native language, Mien, to refer to mother, but cites no evidence for this supposition, and it is contrary to mother's testimony that the minor did not call her anything during the visits. While the minor seemed to enjoy her visits with mother, the minor's repeated reluctance to initiate or receive hugs, together with the minor's apparent lack of emotion at the end of the visits, supports the juvenile court's conclusion that the minor viewed mother positively but was not attached to her as a parent. (Cf. *In re E.T.* (2018) 31 Cal.App.5th 68, 76 [children who were sad, withdrawn, and acted out after visits with parent had beneficial relationship with her].)

Mother argues any reluctance on the minor's part during the phone calls while mother was in jail or at the visits was normal behavior for a six-year old child who had no face-to-face contact with a parent for over a year. This argument ignores the impact of the long period preceding this dependency case in which the minor lived with the grandmother. More importantly, it implicitly confirms that the minor's separation from mother due to mother's incarceration negatively impacted their relationship.

Mother further contends that the evidence for all four factors together constitutes substantial evidence that mother has a valuable, parental relationship with the minor, rather than that of a friendly visitor, so that

27

substantial evidence does not support the juvenile court's finding to the contrary. But even if mother were correct that the record contained evidence that would support a finding that mother occupied a parental role for the minor, that does not mean the juvenile court's finding to the contrary lacks substantial evidence. On substantial evidence review, we consider whether there is substantial evidence to support the finding the juvenile court made, not whether substantial evidence would support a contrary conclusion. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1162 [on substantial evidence review, appellate court must "affirm the order even if other evidence supports a contrary finding"].)

On the third and final element of the beneficial relationship exception test, the juvenile court did not abuse its discretion in finding mother's relationship with the minor was not a compelling reason to forego adoption. For this element, "the parent must establish that 'the relationship [between parent and child] promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (*Caden C., supra*, 34 Cal.App.5th at p. 105.) "'"If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."'" (*In re Anthony B., supra*, 239 Cal.App.4th at p. 397.) For the reasons just discussed, mother's

28

relationship with the minor here does not rise to this standard, as it does not appear to be so strong that its severance would greatly harm the minor.[8]

## III. Ineffective assistance of counsel

In her final argument, mother contends the juvenile court's orders denying her section 388 petitions and terminating her parental rights must be reversed due to ineffective assistance of counsel. She argues her counsel below did not represent her competently by (1) failing to enforce her visitation rights; (2) failing to call any witnesses or make any argument at the 12-month review hearing and failing to file a petition for writ of mandate to challenge the termination of reunification services; (3) failing to point out the juvenile court's legal error regarding its authority to grant her section 388 petitions; and (4) failing to subpoena a key witness, object to inadequate

---

[8] Mother argues that her success in remedying the conditions that led to the dependency help demonstrate that the beneficial relationship exception applies. While *Caden C.* examined such evidence in concluding a parent had not established the beneficial relationship exception, the Supreme Court granted review to address the relevance of this evidence. (*Caden C.*, *supra*, 34 Cal.App.5th at pp. 111–112.) To the extent such evidence is relevant, we recognize that mother made progress in remedying her substance abuse problem and we applaud those efforts. But we do not conclude that this evidence, alone or in consideration with the rest of the record, shows a lack of evidentiary support for the juvenile court's finding against the exception, nor do we find that the evidence establishes the applicability of the exception as a matter of law. (See *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 ["where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"], disapproved of on other grounds by *Conservatorship of O.B.*, *supra*, 9 Cal.5th 989, 1010, fn. 7.)

We also note that the Supreme Court granted review in *Caden C.* to address the appropriate standard of review for the beneficial parent-child relationship exception  Whether the proper standard is substantial evidence, abuse of discretion, or a mix of the two, we find no error in the juvenile court's order.

evidence of adoptability, or introduce sufficient testimony or evidence to support the beneficial interest exception to termination of parental rights.

Section 317.5, subdivision (a) states, "All parties who are represented by counsel at dependency proceedings shall be entitled to competent counsel." "Where, as here, the juvenile court has ordered parental rights terminated, a parent has the right to seek review of claims of incompetent assistance of counsel." (*In re Darlice C.* (2003) 105 Cal.App.4th 459, 463.) "A parent seeking review of a claimed violation of section 317.5 must show a violation of the statute, i.e., that counsel failed to act in a manner to be expected of reasonably competent attorneys practicing in the field of juvenile dependency law." (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1667–1668.) "The parent must also establish that the claimed error was prejudicial" under the harmless error standard of *People v. Watson*, *supra*, 46 Cal.2d at p. 836. (*Kristin H.,* at p. 1668.) "Thus the parent must demonstrate that it is 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)" (*Kristin H.,* at p. 1668.)[9]

Mother argues she is only required to make a prima facie showing of prejudice to warrant a new hearing, citing *Kristin H.*, *supra*, 46 Cal.App.4th

---

[9] Mother briefly asserts at various points that she also has a constitutional right to effective assistance of counsel. The standard for prejudice for the constitutional right is functionally the same as that for the statutory right, requiring proof of a " 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1711; see *In re Daniel H.* (2002) 99 Cal.App.4th 804, 812 [statutory right to effective assistance of counsel "has been interpreted in substantially the same manner as the constitutional right"].) Mother implicitly admits as much by citing caselaw concerning the statutory right in support of the *Strickland* constitutional standard. For simplicity, we use the *Watson* formulation of the standard.

30

at page 1642 and *In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1259–1260 (*Eileen A.*), disapproved of on other grounds by *In re Zeth S.* (2003) 31 Cal.4th 396.)  However, *Kristin H.*'s discussion of ineffective assistance of counsel arose in the context of a habeas corpus proceeding.  (*Kristin H.*, at p. 1642.) The court used the prima facie standard only to determine whether to issue an order to show cause and, if necessary, hold an evidentiary hearing on the habeas petition.  (*Id.* at pp. 1672–1673.)  *Kristin H.* did not hold that a prima facie showing of prejudice is sufficient to require an outright reversal in an appeal.  (See *id.* at p. 1672.)

Eileen A. did arise from an appeal, and the court there stated that a prima facie standard was all that was necessary to trigger an "updated review hearing."  But *Eileen A.* cited only *Kristin H.* as authority for this approach.  (*Eileen A.*, *supra*, 84 Cal.App.4th at pp. 1259–1260.)  Moreover, *Eileen A.* appears to have believed a prima facie standard applied because reversal would result only in an "updated review hearing" rather than requiring the lower court to grant the relief a competent lawyer would have requested.  (*Ibid.*)  Our Supreme Court disapproved *Eileen A.* in part because it disagreed with *Eileen A.*'s notion that reversing and remanding for an updated review hearing had less of an impact than an outright reversal.  (*In re Zeth S.*, *supra*, 31 Cal.4th at pp. 411, 413–414.)  This disapproval indicates that *Eileen A.*'s application of a prima facie standard was incorrect.  We therefore decline to follow *Eileen A.*'s statements on this point.

Before examining the merits of mother's claim of ineffective assistance of counsel, we note that her arguments suffer from significant procedural problems.  First, ineffective assistance of counsel claims are usually brought via a petition for habeas corpus because such claims most commonly require evidence of trial counsel's motivations not reflected in an appellate record.

31

(*In re Darlice C.*, *supra*, 105 Cal.App.4th at p. 463.) When ineffective assistance of counsel is raised via appeal, as in this case, we may find counsel deficient only if "the appellate record demonstrates 'there simply could be no satisfactory explanation' for trial counsel's action or inaction." (*In re S.D.*, *supra*, 99 Cal.App.4th at p. 1077.)[10]

Second, two of mother's arguments concern the conduct of her counsel before the termination of reunification services. But after the termination of parental rights, a party generally cannot use an ineffective assistance claim to challenge orders made earlier in the case. (*In re Janee J.* (1999) 74 Cal.App.4th 198, 206, 208.) This principle–known as the " 'waiver rule' "– exists to prevent late consideration of ineffective assistance claims from defeating a child's need for permanence and stability by creating a back door to appellate review of matters which by statute must be challenged via writ petition or not at all. (*Id.* at pp. 206, 208; § 366.26, subd. (*l*).) Courts have recognized an exception for situations where barring an ineffective assistance claim would offend due process. (*Janee J.,* at p. 208.) But mother has not tried to argue that the ineffective assistance she complains of qualifies for the due process exception, and we doubt she could make the necessary showing.

We need not further examine these procedural issues, however, because mother's ineffective assistance of counsel arguments all founder on the issue of prejudice. When considering an ineffective assistance of counsel claim, we "need not examine whether counsel's performance was deficient before examining the issue of prejudice; instead, we may reject a claim of ineffective assistance of counsel if the parent does not show the result would have been

---

[10] Mother indicated in her briefs that she intended to file a petition for writ of habeas corpus, but she did not.

32

more favorable but for trial counsel's failings." (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 261.)

### A. Visitation

Mother first argues her counsel's failure to enforce mother's visitation rights after September 2018 during the 12-month review period or at the 12-month review hearing in January 2019 prejudiced her because if her counsel had raised the issue, the court would have ordered more visitation, which in turn would have given her more evidence to support her section 388 petitions and her argument based on the beneficial relationship exception. She also argues the lack of visitation would have required the court to find the agency did not provide her reasonable services and to extend her reunification services for six more months. We do not agree.

To start, mother faults her second attorney, who was appointed in September 2018, for failing to raise the lack of visitation because mother's inability to see the minor during mother's year and a half in jail was detrimental. But this argument does not pass muster, because mother had already spent 11 months in jail before her new counsel was appointed, and mother does not accuse her prior attorney of incompetence for failure to raise the lack of face-to-face visitation between May 2018 and the end of August 2018, or the lack of such visitation during the six-month review period from November 2017 to May 2018. If mother were correct that the agency could have arranged some form of visual visitation, then her first counsel would be equally incompetent for waiting to request such visitation until the six-month review hearing and failing to follow up on the request for four months afterwards. In reality, the failure of both of mother's attorneys to insist on visual visitation suggests there may have been tactical, practical, or other reasons for not trying to arrange for some form of visual visitation. And as

mother perhaps implicitly recognizes by failing to challenge the competence of her first attorney, incompetence is less likely of an explanation where two independent attorneys took the same course of action.

Even if we accept mother's argument that her second attorney was incompetent because video visits or non-contact visits through a glass panel at the jail were possible and desirable between September 2018 and January 2019, we do not see how such visitation would have changed the outcome of the case. Such visits might have helped preserve a pre-existing relationship, but mother's parental relationship with the minor was already deteriorating before this dependency case arose and further eroded during the first 11 months of mother's incarceration. The grandmother cared for the minor for more than half of her life, both before and after the dependency case began. Given this length of time, together with the fact that it occurred during the most recent period in the minor's life and the minor's young age, we cannot see how a series of visits in the fall of 2018 through glass at the jail or on a phone screen could have recreated a parental relationship between mother and the minor. Visual visits may have helped alleviate some of the minor's initially cautious response during the first physical visit after mother's release. But such visits would not likely have led to such a dramatic change in the nature of their relationship as to make it reasonably probable the juvenile court would have granted mother's section 388 petitions or found she demonstrated the applicability of the beneficial relationship exception to termination of parental rights.

In addition to faulting her second counsel for failing to raise the lack of visitation in September 2018, mother argues her second counsel should have raised the lack of visitation at the 12-month review hearing as a basis for finding the agency did not provide reasonable services, which would have

34

required the court to extend reunification services to 18 months and beyond. (§§ 361.5, subd. (a)(3); 366.21(g)(1); 366.26, subd. (b).) This contention, too, lacks merit.

Like mother's argument faulting only her second counsel for failing to raise the possibility of video visits, this argument artificially separates the 12-month review hearing from the period that preceded it. If we accept mother's argument that competent counsel would have argued at the 12-month review hearing that non-contact or video visitation was feasible and should have barred a finding that the agency had provided reasonable services, then it seems counsel could have raised the issue of non-contact visitation *before* the hearing, both because the court had expressly invited the parties to return to court if there were cost problems with video visits and to avoid any accusation that mother had waived the argument and was sleeping on her rights. (See *In re Christina L.* (1992) 3 Cal.App.4th 404, 416 ["No reason is apparent here why the general principle that a party should not sleep on her rights does not apply" in a dependency action].) As noted above, however, the fact that neither of her prior counsel pressed for non-contact visitation suggests that there may have been tactical or practical reasons for not doing so (including, perhaps, the fact that the minor was sometimes reluctant to speak to mother and covered her ears when mother called from jail).

In any event, we have difficulty discerning any prejudice resulting from counsel's failure to raise the issue of visitation at the 12-month hearing. Even assuming mother's contention that her second counsel should have raised the purported inadequacy of visitation at the 12-month hearing, we are unpersuaded by her speculative argument that services would have been extended and that it is reasonably probable she would have ultimately

obtained a result more favorable to her had he done so.  "[I]t is settled that services need not be perfect but only reasonable under the circumstances." (*In re Christian K.* (2018) 21 Cal.App.5th 620, 628, fn. 5.)  The record supports the conclusion that reasonable services were provided under the circumstances, as the agency attempted to arrange video visits with the jail, but no one in the grandmother's family had the necessary type of phone. Mother suggests that the agency could have set up video chats "using an agency phone or computer," but this contention assumes (without evidentiary support) that the agency phones or computers were or could have been configured to support such chats, and that the grandmother's family could have brought the minor to the agency for such visits on a regular basis.  "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect.  The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547, italics added.)  Mother's contention also ignores the caregivers' seemingly reasonable concern that seeing mother in jail (through glass) would make the young minor "sadder" and potentially be "scary for her."  On this record, the court would likely have rejected any contention at the 12-month hearing that the agency had failed to provide reasonable services by not making additional efforts to arrange for video or non-contact visitation.  We therefore reject mother's claim that her second attorney provided prejudicial ineffective assistance of counsel by failing to raise the issue of visitation at the 12-month hearing.

36

## B. 12-month review hearing

Mother next argues her counsel failed to competently represent her at the 12-month review hearing where her reunification services were terminated. She contends her lawyer should have called mother or other witnesses to testify, presented documentary evidence, raised the lack of visitation, and requested extension of services to the 18- or 24-month marks. She argues that had her lawyer taken these steps, the court would have had to find mother fully complied with her case plan and therefore extend services rather than terminating them. She also contends her lawyer was incompetent for failing to prepare or file a writ petition challenging the termination of services.

We have already determined mother's counsel's failure to pursue visitation did not prejudice her at the 12-month review hearing, and we reach the same conclusion as to mother's other arguments. Mother has not specified any testimony or documents her counsel should have introduced into evidence besides her own testimony regarding rehabilitation. Moreover, even if mother could have shown she had rehabilitated from her substance abuse problem as she contends, mother could not show she had fully complied with her case plan because at the 12-month hearing she was still in jail without any definite date for her release. The court therefore could not have found a substantial probability that the minor would be returned to mother in order to extend services. (See *Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1031 [no substantial probability a child would be returned to parent by 12-month mark where parent would not be released from prison until nearly 18 months after the dependency began].) And because the court did not err in terminating mother's reunification services, her counsel's failure to file a writ petition did not cause prejudice. (See also

*In re Janee J.*, *supra*, 74 Cal.App.4th at p. 210 [parent, not attorney, bears burden of pursuing appeal rights, particularly following order setting section 366.26 hearing].)

### C. Section 388 petitions

Mother contends her counsel provided ineffective assistance with respect to her section 388 petitions because he failed to point out to the juvenile court that it did not need any additional statutory authority to grant the petition and resume reunification services. We concluded above that the court would have denied a hearing on those petitions because mother failed to make a prima facie showing that resuming reunification was in the minor's best interests. This demonstrates that any failings by mother's counsel regarding the section 388 petitions did not result in prejudice.

### D. Section 366.26 hearing

Mother finally argues her counsel failed to adequately represent her at the section 366.26 hearing. She asserts her counsel failed to challenge the adoptability finding by subpoenaing the grandmother to obtain her testimony regarding adoptability, objecting to the inadequate adoption assessment report regarding the grandmother, and cross-examining the social worker about the inadequacies. Even if these actions showed incompetence, they caused no prejudice because, as discussed above, the juvenile court did not rely exclusively on the grandmother's willingness to adopt the minor to find the minor adoptable. The minor's own character traits and positive attributes made her eminently adoptable by someone. Similarly, even if mother's attorney had succeeded in showing the grandmother could not or

would not adopt the minor, the court would have still found the minor adoptable and terminated mother's parental rights.

Mother also faults her counsel for not creating a record to support the beneficial relationship exception. She argues her lawyer (1) failed to enforce mother's visitation rights and thereby deprived her of evidence to support the exception; (2) failed to question the social worker, visitation supervisors, or relatives or introduce visitation notes to prove the quality of mother's visits with the minor before and after mother's incarceration, the importance to the minor of her relationship with mother, and that mother no longer posed any risk to the minor; (3) failed to subpoena and enter into evidence a bonding study or a minute order from mother's first criminal case to prove she no longer faced criminal charges.

Leaving aside the visitation issue, which we have addressed, nowhere in mother's arguments is any indication of what specifically the missing evidence would have proven aside from her rehabilitation. She appears to assume without explanation that the missing evidence would prove she had a parental relationship with the minor. But mother testified about the visits and offered testimony from a third party who observed the visits, and such testimony was insufficient to establish the exception. Absent some specific information to suggest that the missing information would have supported mother's case better than her own testimony, she cannot prove it was reasonably probable that the outcome of the section 366.26 hearing would have been different had her counsel taken the steps she outlines here.

## DISPOSITION

The juvenile court's orders are affirmed.

_____

BROWN, J.


WE CONCUR:


_____

POLLAK, P. J.


_____

STREETER, J.


*In re A.K.* (A157369)

40